We'll hear the next case, H'Shaka v. O'Gorman. May it please the Court, Bijan Amini for the Plaintiff Appellant Imhotep H'Shaka. May I ask you, just at the outset, where do things stand in terms of a timeline in a district court? Well, we were discussing that yesterday. There's no trial in sight, so discovery will end at this point. I believe the latest is May of this year. We expect summary judgment motions. The Court is busy up there in the Northern District, so we anticipate another year. The Proctor case still hasn't been tried. Proctor's in step-down, and I don't know if the government's told anybody, but we find this out through the grapevine. After your decision— I'm sorry, the Proctor what? Is in step-down. They let him out. So it's sort of settled. It's not clear, Your Honor. In August, his trial was coming up, from what I understand. This is through the prison grapevine. In August, his trial came up, and the trial was put off. No reason was given to us, and so we understand he was sent to an Attica facility, where they now have three people, we think, in what they call the step-down facility. His trial was scheduled again for just two weeks ago, I believe, and the notation in the file is that it's been adjourned and the parties are to go talk. Excuse me. My understanding was that it was scheduled for trial soon, and I guess I was raising that because it supports your point that it takes a while after— even in a case where summary judgment motions had already been decided and then denied in effect by this Court and remanded, we're still waiting for a trial in that case. And in your case, we're not up to summary judgment motions. But Proctor has gotten what we want, which is all we want. Nobody's asking to take this human being. But that, I'm not sure, does cut you away because Proctor got what you want from the agency, not from a court, not from a decision, a judicial decision, that he'd been denied due process. I have a suggestion. After I explain to you why I think this case screams for further consideration for this man in the same place, as to how maybe the Court could arrange this so that the government will give my client what he wants as opposed to have the Court having to force it, which I guess I'm getting to the punchline quickly. Could you cut to the chase? Yes, to the punchline. If you send it back with concern for this record, and I can explain to you in detail why everything they say in this record is a sham, in great detail, with a concern based on Proctor for whether the district court properly took consideration and for a hearing as to why he shouldn't be in ADSEC, dollars to donuts the way these cases are going, we will be before that judge, and if they don't have a witness to come and explain fully why he should be there, he will be in ADSEC, and we will get adjourned until they see, after six months or a year, I don't know what time frame they have. They're not letting these people out. They're slowly watching them. We're not putting the prison folks in any great harm's way in that way, too. I'm suggesting that the Court below was wrong in its analysis, and this Court should send it back to it and say you're wrong, and what you need is we would like to see a hearing on why he shouldn't be in what's called step-down towards getting out of administrative segregation. What is the authority for that? I understood that the issue, and tell me if I'm wrong about this, I thought the issue was whether the prison authorities were acting in good faith, not whether we think or the district court thinks that he should be placed in one category or another. I agree with that, and that is the issue, and I would suggest to your honors that on this record I could show you they weren't acting on good faith, but given you could come to the conclusion I want, I think, and I'm not the court, obviously, but by saying, but there is this countervailing concern that we have as a court, which we all have for the people who work in those facilities and for their safety and their security. So on this record, we don't think you've shown he should stay there, but given that countervailing concern and given the status of this record, we're sending it back to the district court to rethink that. It may very well be that I end up back in front of you again, but nevertheless, I am of the belief if that happens- Is the district court supposed to do when it gets it back? Hold a hearing to determine, for the prison authorities to explain to the district court in nuts and bolts why he's not appropriate for stepping down, and step down is just move him to a facility where they watch him for some period of time, very carefully, you know, given his- Why won't they say the same things that they've said? I mean, in Proctor, Proctor is different in the sense that in Proctor, and correct me if I'm wrong, in Proctor, the authorities basically said there's no way that Proctor is ever getting out because of his- or being moved to other confinement arrangements because of his past violent behavior. It was fairly absolute. It was absolute. In this case, you have authorities saying, well, he may be considered in the future. Others say, you know, he's got this violent past. It's a different situation than Proctor, isn't it? In Proctor, it was absolutely clear that Proctor was not being given any chance, whereas here, the officials have taken a different stance. Judge Katzmann, I would respectfully disagree with you about that. I'm not saying that's my view. I'm just posing the question to you. The officials, they figured it out. So you give them Proctor. So now what do they say? Instead of saying he's never getting out, oh, no, he's a strong candidate for getting out. Why should we assume that that is bad faith, particularly given that, as you've just said, and as their affidavits make clear, now, as opposed to the situation at the time of Proctor, where no one had ever been allowed out, several people, including Proctor, have been put into some other situation. And I don't know about those other cases. Are they all cases where there was litigation, or are they cases where there was a we don't know? No, no. I have no basis to say, as you said earlier, that, well, now under pressure from the courts, other than the pressure of Proctor and its precedent and the pressure to act in good faith, that they only let people out when they're forced to. There have been cases of people put into step down or even perhaps, I don't know, maybe into general population, at least let out of ADCIC. But Proctor was more than just there saying, we're never going to let him out. There was also, we can't let him out because he's in a we can't judge in this situation whether he's safe to let him out, because we've kept him in such a safe place. There's no basis. That, in Hishaka, at root, if you read all his ADCIC reports, at root, they can't decide what to do with him. They're making no decision, and no decision is just leaving him there. And the bad faith, I want to address it very briefly, because we brought this motion, we spent three years, PLS, Prisoners Legal Services, writing letters, not filing lawsuits. Please do something for this man. Please move him. He's desperate, and please move him. He's done everything you've asked. When that didn't happen, in January 17, we filed the suit. We filed the PI motion on September 17, 2017. His last report, ADCIC report before that one was, he was, quote, a strong candidate. That was almost two years ago. Strong candidate for removal. Three days after we filed the PI motion is his current misbehavior report. And what is his misbehavior report? Because it doesn't come out of this record. He, for years, he's been in prison. He gets to contact his family currently for 15 minutes a month. He gets one 15 minute a month phone call. That's his out of prison time to speak to his family. And how it happens. He calls his mother in Florida. She puts his brother on, and then they connect his sister by a cell phone. And that's the call they've been having for years. Three days after we filed the PI motion, that call is cited as a violation of rules because it's a three-party call. And then, before the hearing on that call, a week before, the affidavits come in here that say, you know, he was a perfect candidate until we got that misbehavior report. That's what Kelly, who's this head of security, Scott Kelly, says. It's the only thing he cites. He says, that phone call, see, he can't follow rules. A week later at the hearing, he says to the hearing officer, I've been in ADSEC, and where is this third-party call? I don't know. You record all my calls. This is the same call I've been having for months and years. Nobody's said anything. And the hearing officer, who is himself a Department of Corrections official, says, okay, I find you guilty. All right? You're counseled. You know the rule. No other punishment. You can have your call next month next. Now, on that basis, we have a man who's been in solitary for 23 years, eight of them in this nebulous ADSEC where the gorman, who's the director of the place and makes the final decision, the only thing he has in his affidavit is this is a very violent man in his teens and 20s, and my gut tells me. He doesn't say another thing about this man. Kelly, who says, he was ready, but that phone call, we're done. And then he has, you have one more affidavit. You have an affidavit from an officer named Randall. And this goes to the due process, too. What Randall's only point is, is that Hishoka has a short temper. And I once, I can't remember when, but I once didn't give him a hat. He was entitled to his Rastafarian hat. And if looks could kill, he would have killed me. And Hishoka was like, I don't, we looked in the record, and we dated that back three and a half years. Because he had, Hishoka is a man who asserts his rights. In 2014, the reports talk about the positive attitude. Exactly. There's not a single thing about what Kelly says. Where is that due process? You know, they have taken your proctor decision, and they've parsed it carefully. Let's write a bunch of things that say he's ready. They've been saying he's ready to him for five, five and a half years. There is nothing in this man's record that he's done not to deserve to get out. 20 years, there's nothing in this man's record that indicates one iota of violence. Now, granted, at age 17, right, before he's 18, he kills a man. At age 22, he slashes a guard so severely, and two others, that they have serious injuries for which they beat the crap out of him. But that's okay. All right, he spends 14 days in the hospital. And then he spends 12 to 14 years, he is sentenced to shoo, and he spends his 12 years figuring it out. In fact, he spends it so that by 2008, he goes on good behavior. From 2008 on, there's things. There's a 2015 contraband. Ask them. Nobody even mentions it in these reports. In fact, the report in which the contraband comes up, the Ad Sec report, says he's got this great attitude. He's really a good guy. So what do we have? We have this phone call now. He can't go on the phone call. And the one report before the brief was due here in November of 2017, suddenly, out of nowhere, a sentence. He shows no remorse. And that, between the phone call and the no remorse, will keep him there another five years. He's on a 9 by 11 box. And I think the courts have come to realize, all right, that there is some degree of concern that we keep them there. He's 46 years old. He's got the social abilities of a 20-something when you spend time with him, because he's never had any social interaction. His worst period is at the beginning of 2013, where he's been in upstate for a number of years. And I've come to learn this. You have a video of his prison cell in Clinton, which they advertise now as it's not really solitary. But in Clinton, it's four walls. No window. No bars. He spent 1.3 years in those four walls. Never came out for two visits and an ophthalmology exam. Three straight years. 1,000 days in four walls. A gate that opens to a little balcony where he can't even see anybody. He can't talk to anybody. The food comes through the slot. He's done his time. And what I'm asking for is not to put them at risk. I would never put them at risk. I'm not asking you to substitute your judgment for the judgment of these people. I'm asking you to take a really hard look at this record. I brought all the sites. I can tell you every ad sec report since 2014 and what's in it. By way of example, one more example, and then I'll cede. But the one more example is the court below took it upon itself, and I don't know why. It added one more thing that nobody raised. It said, see, you had a misbehavior report in the middle of 2016, July of 2016. And there's another example where he's uncooperative. That misbehavior report hits his July 16th ad sec and disappears on his September 2016 ad sec. And when they talk about the phone call, they say, no, he's been clear for more than two, two and a half years. In other words, that misbehavior report that the court below took it upon itself to add on those pages 18 and 19 when it lists the factors, that doesn't even exist in his record. So think about what he's in there for. The reasons given for keeping him now are the phone call, the district court saying the 2016 report, and Sergeant Kelly saying three and a half years ago if looks could kill when I took his hat. I didn't bother to tell him that then so he could respond to it in his reports, but I'm telling it to you now and watch out. This man deserves to go to step down. I need to find a way to get him there. Perhaps bring another PI motion. I mean, we're now, the report in July said he was a strong candidate to go out. We're now in 2019. And he's coming into his 23rd year, his sixth year in a row of being on perfect behavior. At some point, you have to give him the chance. One last point I want to make about this man is he's intelligent. If you read his letters, he's highly intelligent. He writes well. He thinks. He started college before he went into ad sec. So at 22, he gets into ad sec. He can't, I mean, into SHU, he can no longer, I mean, college. He could get out of college. He's intelligent. And what intelligence brings us in a case like this is, look, if they let you in that, and you so much as flinch, you will spend the rest of your breathing days and life in that box that so freaks you out right now. And you know that. So you can't move. This will be your only chance in life. I honestly don't, I think that if you really, truly hit this record and look at it carefully, the other thing that comes, one other thing that comes out of it, I have a list of it, is they continually refer to the fact that Mr. Hishaka asserts his rights. He's a man who writes the, every time he gets his ad sec report timely, there's a letter in there. You know, you've now changed what I did to people 20 years ago, and that's all you're talking about. And you know, could you please just get the facts right so I get a free chance? So I'm trying to find a way to get it there, and I understand, Judge Lynch, you're right. I don't have, you know, we've talked about it internally, I don't have a great way to snap my fingers. I don't believe I can convince the three of you to reverse the court below and just send him to ad sec. Nobody wants to substitute their judgment for the judgment of the prison authorities. So I'm trying to find an in-between way, because I really do think that this decision is a bad decision to leave on the books in light of Proctor. If you want Proctor enforced, don't send it back with them to say it's okay to just say, he's a good boy. And if he just keeps being a good boy, one of these days our gut will tell him that we'll give him that chance. Thank you. Thank you. May it please the court. This appeal is principally a factual dispute. The district court credited testimony and documents which reflected that plaintiff's ad sec reviews, one, are real safety evaluations, two, consider his current behavior, and three, are open to the possibility of release, either to GenPOP or to some step-down program. Your adversary says that this openness is more illusory than anything else, that if authorities were really serious, that there was enough there that would lead them to say that he should go to be in another status. And certainly there are a lot of reports in which Ashoka is commended for his good behavior. There are a number of reports which indicate that he's about ready to transition. And so I realize that we may be constrained in this particular circumstance, given the posture of this, the procedural posture of this case. But the concern that your adversary is raising seems to have some legitimacy to it. Your Honor, it is a legitimate concern that anyone in plaintiff's position would have. But just to respond to it. What does he need to do to get into another status? Well, what he needs to do, the other side asks what are the goal posts, what are the goal posts. He is entitled to goal posts. We think we've given him goal posts. I'll recite those. But what he's not entitled to is a playbook as to how to get to and through that goal. And the reason he's not entitled to that is because it's impossible to give one. As this Court recognized and as the Supreme Court said in Hewitt, ADSEG safety evaluations can, and in this case often do, hinge on, quote, purely subjective evaluations and predictions. So with that caveat, I'll go through some of the goal posts that have been given in this case. The number one. Would it hold if you had somebody in a decision-making capacity who was paranoid, clinically paranoid? I'm sorry, Your Honor. I think I didn't catch the first part of your question. I said do you think that what you just recited would hold if you had somebody in a decision-making capacity who was truly paranoid? I think it would hold if that paranoia had somehow met, if that paranoia were one of the circumstances that in turn were taken into account. I mean, again, prison officials, when they make these determinations, they take account of the totality of the record. Here in the record there's evidence that Mr. Hoshaka has been seen periodically by mental health services, excuse me, by health services. So there are certainly people there who can take account of any potential psychological concerns. But the goal, there are goal posts that have been given in this case. And the first one. Well, let's, you'll have time to talk about your goal posts, but let's talk, for example, about the instance of Sergeant Randall and the 2014 report. So Randall says that he'd seen Hoshaka lose control of his temper going from zero to 60 when he's not able to get his way. And he cites the 2014 incident with the clothes that Mr. Hoshaka was not allowed to have. But if you look at every report from 2014, every report praises Hoshaka, and correct me if I'm wrong, I may be, for his positive attitude, his positive behavior. Many of the reports do praise him. Perhaps a majority of the reports do praise him. But I will direct Your Honor's attention to page 148 of the record, which is the report, the July 2014 report. I think, although the exact date wasn't pinpointed, I think there was maybe testimony on the other side or an excerpt of the court of claims decision in the record suggesting that this event took place somewhere in summer of 2014. And if you look at page 148 of the record, in the facility committee recap, of course Sergeant Randall is on the facility committee, he's not on the central office committee, so it wouldn't necessarily be part of the larger attachment. But he says, under other factors which may favor retaining the inmate in ad seg, he should, quote, still should be monitored as he has this potential for aggressive behavior. So you're right that the 2014 incident is not broken out in every jot and tittle. But, again, it is referenced, or his possibility of aggressive behavior is referenced in there. It's pretty abstract, this potential for aggressive behavior. It might refer to something that happened in 2014, but the only thing typed previously to which this might refer is the episode in 1999. It could refer to that, Your Honor, but I think more to the point on the procedural posture of this case. This is a PI appeal. Facts were found. Statements were credited. Lieutenant Sergeant Randall's testimony in his declaration that he relied on this incident as part of his ad seg review calculus was credited. It was certainly not discredited. You refer to its being credited, which it was, and you refer to it as testimony, which it is in the form of an affidavit. But normally when we think of a credibility judgment, we're talking about something that took place in person when somebody gives testimony and is subject to cross-examination. Now, Mr. Armini suggested that it might be appropriate to remand this for a hearing. Why was there no preliminary injunction motion? Commonly, not always, not necessarily required in every case, there is a hearing at which testimony is taken. Why is it appropriate to rely on credibility judgments made on a cold piece of paper? How would I decide, for example, whether I should credit what someone says in an affidavit without bringing them in for a hearing and cross-examination? Well, I think it would be the same way that this Court said is possible in, and I'm having trouble recalling the opinion, I think it was a Judge Cabrera's opinion, I want to say Orvis, where he said the same credibility determinations, the same standard, clear error for factual determinations apply to review of a preliminary injunction where credibility determinations were made on what you call a cold record. And in this case, the plaintiff controlled when he moved for the PI. There were no depositions of these folks in the record yet, and I suspect some of them may have been taken or may be taken. The close of discovery is not until March of 2019. But he could have waited for depositions and tried to catch these people in a lie, for example, and then moved with that evidence, and there would have been more to support his side of the case. He could bring, as I think was discussed either by my friend on the other side or Your Honors during his colloquy, he could bring another PI motion now based upon any additional evidence that has been produced in the interim, and he could bring all of that to bear. So the fact that that sort of evidence is not in the record now should not be held against the district court in reviewing its decision on the PI motion. But I do want to touch on one point, a couple points actually, but one point certainly that the other side harps on in its brief and also here today. They suggest that it's something of a sham to make the plaintiff show that he's fit for a less restrictive environment and to make him make that showing while he's still in ad se. There's nothing irrational or a sham about that. I've got a practical point and a penological point. The practical point is if you hang your hat on something that happened in 1999 or 2002, then how can anybody in his position show that he's not violent? I mean, if the basic thrust of the determination hinges on something that happened a long time ago, then how can he in his present circumstance show to you that he's no longer violent? Well, some concrete things he can do are, for example, not masturbate in front of a CO in 2012, not disobey direct orders in 2003, not possess contraband in 2015, and not make an unauthorized conference call in 2017, in which he was found to have been inquiring about one of the COs that he brutalized back in 1996. Wasn't it determined that that incident didn't justify any suspension of his telephone privileges? Is that correct? That's correct as a disciplinary matter, Your Honor. I didn't mean to interrupt, Your Honor. Oh, go ahead. That's correct as a matter of discipline, backward-looking discipline, but this is a forward-looking ad-seg calculus which the district court credited. But I would think that if somebody is not, should not be subjected to discipline, that's also a forward-looking calculation. Well, it's a forward-looking calculation in terms of what happens in the future, but I'm trying to differentiate the ad-seg calculus in terms of prospective safety threat from whether certain disciplines should be meted out to ensure that plaintiff will indeed follow the rules going forward. But the penological — Was that call recorded? I would imagine it was recorded. We don't have a recording of it in this record. If the call was recorded, that could be one of the other items of evidence that my friend on the other side could bring in a summary judgment-type motion. And is there anything in the record in the way of evidence with respect to Mr. Amini's assertion that Mr. Hishaka had previously engaged in the same kind of conference calling without repercussions? There is. There's Mr. Hishaka's testimony in the record, and there's no testimony on the other side. We don't doubt that he has engaged in that sort of behavior before. On telephone calls that were monitored and recorded? That's right. But there's certainly — Doesn't that give something, some credence to the assertion that there's something of a pretext that after he files a preliminary injunction motion, suddenly the behavior that he's been engaging in that may have been a violation all the time but nobody cared enough about even to say to him, hey, cut that out, it now becomes a subject of discipline? It doesn't, Your Honor. And I think the reason it doesn't is because there's no evidence in the record that any of those other calls, unauthorized calls, alleged unauthorized calls, were made to inquire about the victim, one of the COs. So what's the problem with — it's not the problem that it's the conference call. It's the problem of the content of that call? Well, it's the problem of both, Your Honor. Violating rules while you're in — So back to the question. Where are the tapes from the other calls that demonstrate that he has been engaged in this behavior all the time? I don't know where the tapes are. The other side has put forward that evidence in an affidavit. He has done that, right? Yes, that he has done that without repercussions in the past. There have been affidavits — Are these calls all taped? I believe they are, Your Honor. I don't want to — And the tapes are maintained? So just for such purposes as determining future security risk in ADSEG proceedings? I believe they are maintained. I don't believe they're maintained exclusively for ADSEG purposes. I believe they're maintained just as a matter of ordinary course of prison administration. Obviously, safety is one principal purpose of that. But these judgments in terms of how much weight to accord, say, this incident or any of the other incidents of misbehavior or his past transgressions, these are penological judgments that it would be — Mr. Ginsburg, I missed in the record, no doubt from my own weaknesses, any reference to what you told us about the inquiry about the corrections officer. Where would I find that as part of the content, either the factual assertion or both, the factual assertion that that was part of the conversation? And secondly, any reference to that as being part of the rationale for keeping him in ADSEG? You could find both, not in the ADSEG reports, but in the declaration of Scott Kelly, and you can find it at page A465. But again, these are — Is there any verbatim account of what this — I'm sorry, page 4 what? A465, Your Honor. A465. Is there any verbatim account of what exactly he said? I mean, something that says, gee, I hope that fellow that I cut is okay. That would be a little different than, you know, have you been keeping track of this guy and where he is at? So I'm just wondering, do we have any of that? But the actual prison administrators, Mr. Kelly, he's determined that, look, we don't want people inquiring about their past victims and perhaps trying to reach out to them or the like, period. And that penological judgment is something that, as this Court said in Proctor, it would be, quote, an impermissible substantive appeal to review. And that's really the basis why this case is so different than Proctor. Well, let's go to the question of — it's a very fine line between making a penological determination or second-guessing a penological determination about what the significance of something is and looking to the question of pretext. If somebody makes a mountain out of what almost anyone might think is a molehill, and I'm not suggesting that this is because I don't know what was actually said specifically. But if someone seems to be distorting the content, for example, to make something look malicious, that would go to their credibility, I would take it. So it's a hard thing to draw an absolute line as to what the Court can inquire into. But I do see now in the record what you're referring to in terms of what the district court had before it. What the district court might have before it if the — either on a further motion for a preliminary injunction or if there were further proceedings on this motion might be different. It may well be different, and that was the next point that I was hoping to get to, is that this P.I. motion, again, was taken up at the time that plaintiff wanted to take it up, and this is plaintiff's record on this P.I. motion to make. I did just want to return, though, to the issue of — It would have been — it was entirely open, I take it, to Mr. Hishoka and his attorneys to get a hold of that tape, and if it cast aspersions on Sergeant Randall's concerns, they would have been able to bring that out. Sure. I think it was Sergeant Kelly in this case. But, yes, absolutely, Your Honor. I do want to make — just finish a point I made before I sit down, though, because it's such a critical part of the reply brief, that there's nothing sham or pretextual about requiring the plaintiff to show his fitness for a movement to a less restrictive program even while he's already in Ad Seg. As I think I discussed, it's not an impossible burden that three inmates under Mr. O'Gorman — The point I think that the plaintiff was making, and maybe you could respond to this more directly, is that it's actually said we can't — they say we can't really make a — draw a positive conclusion necessarily as to what he'll do when he goes back in general population because right now he's in a place where he's not really tested. That's right. I thought that was their point. They can't — that's right. Prison officials cannot make an absolute conclusion, so what they have to do is rely on the same sort of analysis that the Supreme Court blessed in Hewitt, which is that subjective predictive analysis. So what they do is they don't disregard evidence of good behavior in Ad Seg. The best evidence that they don't disregard it is those enthusiastic recommendations in July and August of 2017 that at that time — which the district court credited — that at that time the plaintiff was a strong candidate for transition. But what they do is they apply the appropriate discount factor, that good behavior in Ad Seg is not worth zero, but it's just not worth the same as good behavior in Gen Pop. So when they're trying to get the Gen Pop value of that Ad Seg behavior, they apply the appropriate discount factor and in reverse for bad behavior. Of course, I take it that even with these folks who have been released from Ad Seg, they don't go to general population, right? There's whatever this step-down thing is that's somewhere intermediate. That's right. And excuse me, I was being a little too — Okay, I get your point. But on the subject, by the way, of people being released from Ad Seg, I think that's another reason why the district court so compellingly resolved and credited the factual testimony that it credited. It wasn't made much of it today, but in the briefs there was talk of delays in the periodic reviews at certain points in the process, and all of that changed on or about July or August 2017. Certainly by fall 2017, when Mr. O'Gorman became head of the program. I think the most plausible explanation, and certainly something that shows that it was not clear error for the district court to make these good faith credibility determinations of good faith that it made, is that whatever issues were periodically plaguing the program before Mr. O'Gorman's tenure, when Mr. O'Gorman got on board, he really cleaned house. No, I understand that point. With respect to Commissioner O'Gorman, he says, and I'm quoting, that he was tasked with predicting whether Hashaka's lifelong violent history has dissipated by a few years of appropriate conduct while confined to SHU. And if we think in terms of lifelong violent history, that's, as I understand it, is a period between 85 and 99, right? That's certainly most of it, yes. And there have been no violent incidents since then. And the argument is, well, that's because he's locked up in administrative segregation. That is an argument. That's certainly the penological judgment. I think a large part of the penological judgment that Deputy Commissioner O'Gorman and Sergeant Kelly and Sergeant Randall have been making. What does lifelong mean? If lifelong is between, when I hear lifelong, I understand that to mean something that is recurring. But here, lifelong is, how could it be lifelong if, as you said, it's between 85 and 99 and there are no violent incidents since? I guess I would focus not as much on the word lifelong, but on the other word in that sentence that has to make it make sense, which is history. That he's really talking about what happened in the past. It was a large part of his life, from his incarceration in DFY in 1985, I believe, perhaps later in the 80s, where he started assaulting guards and the like, up until 2000, or certainly 1999. But again, the district court credited Mr. O'Gorman's testimony, despite that perhaps slip of the pen or inartful expression, that these ADSEG reviews are real safety risk evaluations. And they do and they may take into account past behavior, even distant past behavior. Absolutely, Your Honor. And here's why they may do that under Proctor. Under Proctor, the question— Don't tell me. I was helping you. Well, thank you very much for the assist, Your Honor. I'll tell the panel. The reason why they may do that under Proctor is because procedural due process, which is the only one of the claims that plaintiff has moved on in this PI, requires consideration at the beginning of the day for all relevant evidence, including current behavior. It doesn't require weight be given at the end of the day to such evidence. Now, it so happens on this record, there's substantial weight given to current behavior, both current bad behavior, as you've seen, as the other side claims is even too substantial, the weight that's been given, and current good behavior, which has resulted in those enthusiastic recommendations in the July and August 2017 reviews. But allow for the consideration of the impossibility, as I think has been laid out here, at least in argument, of ever producing the evidence that's going to satisfy the burden. There's no impossibility. The reason why—I'm trying to be responsive. It's impossible if I take somebody and lock him up in an 8-by-12 room and say, well, we can't tell. We need to know how you're going to behave with other people, but you're never going to get to be with other people, and we're not going to be able to tell that. No, Your Honor, and I think that was the colloquy that I was engaging in with some of your colleagues, is that they don't discredit, they don't give zero value to good behavior while in ad seg. They apply a discount factor. So there's not a one-for-one tradeoff. It may take— I can discount stuff down to zero, and we don't know because I think we've said we're not entitled to know what discount factor applies to that portion of the analysis of the evidence. I guess we don't know mathematically, but we know that it's greater than zero, and the record indicates that we know that it's not just greater than zero but substantial because only through that— I mean, remember how horrific this past behavior was. So only through substantial weight given to subsequent good behavior could he possibly have produced the enthusiastic recommendations in the July and August 2017 reviews that Mr. Hishaka is a good candidate for transition and especially serious attention should be given to that sort of transition. And at the end of the day, the district court had all of this evidence before it, and it didn't find any procedural issues here. It found, as a matter of fact, that it credited the testimony that these are real evaluations, nonpretextual, and consider, even if they don't give as much weight as my friend on the other side would like, but at least consider current behavior in a fair, good-faith way. Our record closes as of what date? The record closes as of—I'm sorry, Your Honor? As of what date does our record close? I believe it's late November 2017. So we've got a year and a quarter that has passed in the interim. That's right. And so I'm not asking anybody to go outside the record and tell us what's happened since then, but to the extent that a further motion was brought, it might be able to give us an account that says, going back to the date of those very positive evaluations, there would be, by the time that record gets settled, two years' worth of behavior at which the one thing that might then exist, if the record is all favorable to the plaintiff, is this telephone call. Well, it's not . . . At that point, I guess I can't ask you hypothetically, what would you be telling us then? What would you be telling the district court at that point as to why this enthusiasm has dissipated? I guess I'm just suggesting that maybe a message that goes back to your clients here is, really? However this comes out, as a matter of applying an abusive discretion standard to this record and this determination, if after another year of more or less spotless behavior, or only behavior that amounts to something that got shrugged off even when a violation was found, you're really going to be coming back and telling us that he can't take a single step out of ADSEG? Maybe that's something that folks should be thinking about. Well, Your Honor, I think that's right. I agree with you, and that's one of the reasons why this record is so compelling, is that it shows that folks are thinking about that. Mr. O'Gorman's testimony, his declaration was prepared on November 22, 2017. It was after the business with this unauthorized phone call, and he said that even after the phone call, even notwithstanding that, plaintiff is, quote, on the right path to demonstrating that the time may be near to start providing him with fewer restrictions, greater freedoms. I guess I'm just wondering what a long and winding road that path might be after 22 years in solitary. I don't know if you have. I've been in the shoe in maximum security prisons in New York State. I know what it looks like. I didn't need to be told about how crazy it drives people. I saw the people in there, and a lot of them seemed pretty crazy. Some of them, I'm sure, were crazy before they got there, but it's not conducive to mental health, and it is rather an extraordinary thing if somebody can manage to preserve sanity, let alone a good record over a long period of time in such a place. So I hear you when you say everyone concedes he's on the right path, but someday that path has to reach a place, I think, if he continues on it. That's all I'm saying. Well, I mean, I would certainly leave it up to my clients and their penological judgment to say whether that path has to reach a specific outcome, but certainly for the purposes of this case, and I guess I'll try to close on this, is that the due process clause, as interpreted under Proctor, as this Court said, only commands a process, not a result. And the district court found here, and certainly did not abuse its discretion in finding, that that process was, in fact, provided, and for that reason, on this P.I. appeal, this Court should affirm. Do you think it's a process if what you're talking about is goalposts and what you ought to be talking about is an end zone, somewhat wider? Well. Is that something that is cognizable in a process analysis? I don't think he's entitled to. If I could try to carry this sports analogy further, I don't think he's entitled to. Be careful. I'm a Patriots fan. That's okay. I'm a Bears fan, so it's tough. Sorry about that. Thank you. Even though he's entitled to goalposts, he's not entitled to a playbook as to how to get to the end zone, and the reason he's not entitled to that is really where I began, is that it can't be given that these ADSEG determinations, these safety determinations, even though they may trend one way or the other way after lots of many years, many weeks, many months of good behavior, they are, quote, they do hinge on, quote, purely subjective evaluations and predictions, and they constitutionally can do so. Now, to be sure, Plaintiff has other claims in his complaint. He's got more substantive type of claims like an Eighth Amendment cruel and unusual punishment claim of the sort that was brought in the Johnson versus Wetzel case that he talks about, and I think that would be an appropriate vehicle to really examine some of these concerns about the penological justification of this continued confinement and these substantive judgments. But he has not chosen to move on that claim on this P.I. He has chosen only to move on procedural due process, and under Proctor the docs has complied with that procedure as the district court did not abuse its discretion in finding. Thank you. So we would ask that the result be affirmed. Thank you. Thank you. Judge Lynch, I want to take you to A. 512. That's Mr. Hachaka's description of why he asked about C.O. Foley and Saddlemeyer. He was told, he put it in an affidavit that's in the record, he was told by a superintendent, Kurt Patrick, in one of his conversations, look, Hachaka, I'd like to get you out, but one of the guys you slashed died recently, so it's creating problems for us. So he admits in this affidavit that earlier in the summer, before that phone call, he thought it was C.O. Saddlemeyer who was the individual for whom he was convicted of slashing. So he asked his brother to check on C.O. Saddlemeyer. His brother came back and said, no, C.O. Saddlemeyer had died four years before. So in the call in question, he came up with one of the other guys that was in that fight. There were three officers. There was one that he got convicted for, two others that came to get him. So he asked his brother, well, what about C.O. Thomas Foley? Will you check on him and see maybe he's the one Kurt Patrick is telling me died, and there's the reason I can't get out. That phone call is a red flag, I would suggest to you in this case. I mean, the whole thing, that Kelly, that- These phone calls are recorded. They are. They are. I'm told they're recorded, and we don't have a copy of this one, I don't believe. We came back and said, look, this is what happened, and nobody came back and gave us this recording and said absolutely not. In any event, there was no suspension of privileges after. None suspension at all. The hearing officer, quote, the punishment was counseling. Counseling is defined as don't do it again. So that phone call triggered, and to then take that phone call and say- I'm assuming that he's been advised that it would be useful in the future if he's concerned about things like this and wants information to have his lawyers do that kind of investigation rather than family members. At the same time, I do appreciate that one of the things that judges take into account in sentencing and that sometimes the press points to when people are being or have been accused of or convicted of doing something is whether or not they show concern for their victims. So this incident, at a minimum, can be spun both ways and can be spun in a way that's favorable to him. I understand that point. They haven't disputed his version of it. I want to point out that Sergeant Randall does say in his affidavit, the person who has the 2014 complaint, that I have to see him and step down before I could actually ever determine to let him out. He actually says that, but that prompted something I want to- the record in this case is tough. He was in a pilot program. It's in his record. And I don't know if Your Honors are familiar with it. The pilot program was terminated, but during that pilot program, he was a total success. Beyond a success. He got to watch TV for a couple hours. He got to be with other people. He got 30-minute a week phone calls with his family, which is the biggest piece. I mean, he had 30. And then the pilot program, and he was very successful in it. And that gave them an opportunity. He could have done bad things in that pilot program. Nothing in that pilot program. And then what happens is the people settlement occurs, which is the people are being sent to SHU for punishment. And the prison authorities say bureaucratically, well, we don't have money to do the pilot program anymore. You're back in SHU like everybody else. And you were talking to your family once a week for 30 minutes, and that was really important. And important to the safety of security, I would suggest to the prison. You now get 15 minutes a month. That happened in the spring of 2017. Imagine the frustration in this man. And it's in the record over and over again. Why are you now punishing me? I did everything you want. And yet, that summer, those reports say strong candidate, great attitude, great behavior, and they're torturing him while they're saying that. And then the phone call. I take that. Can you conclude? I wanted to make sure that you knew that. The one last thing is the 2013 incident. This may not be in the record. But the 2013, which is the last time he disobeyed an order. It was his third visit to mental health from upstate. And they said, we're coming to get you to take you back to upstate. And he said, I'm not going. And they took him to Clinton. That's how he's really at least not gone mentally insane. That was that event. Thank you, Your Honor. Thank you. Thank you both for your arguments. The court will reserve decision. Final two cases are on submission. The clerk will adjourn court.